UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, <br><br>                         **Plaintiff,** <br><br>    v. <br><br> JOSEPH C. LEWIS, CAROLYN W. CARTER, PATRICK J. O'CONNOR, and BRYAN L. WAUGH, <br><br>                     **Defendants,** <br>    **and** <br><br> JEAN J. O'CONNOR, <br><br>                **Relief Defendant.** | Case No. 1:23-cv-6438 <br><br> **Jury Trial Demanded** |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Joseph C. Lewis ("Lewis"), Carolyn W. Carter ("Carter"), Patrick J. O'Connor ("O'Connor"), and Bryan L. Waugh ("Waugh") (collectively, the "Defendants"), and Jean J. O'Connor (the "Relief Defendant"), alleges as follows:

## SUMMARY

1.     This insider trading case involves billionaire investor Lewis illegally tipping material nonpublic information to his then girlfriend, Carter, and his longtime private pilots, O'Connor and Waugh, so that each would use this information to execute trades. All three of Lewis' tippees traded on the material nonpublic information obtained through Lewis' breaches of trust and confidence, and reaped combined profits of over $545,000.

2.      Lewis is the principal investor in, and chairman of, "Investment Group," which has investments in over 200 operating companies.  The Fund, which is a part of Investment Group, invests in biotechnology companies.  As the president, director, and sole indirect owner of the Fund's manager, Lewis controlled and owed a duty of trust and confidence to the Fund.

3.      From 2015 to the present, the Officer has served as a senior officer with the Fund. As a senior officer, the Officer often learned about material nonpublic information from biotechnology companies in which the Fund invested.  In light of Lewis' role with the Fund and his associated duty of trust and confidence, the Officer often entrusted this material nonpublic information with Lewis.  Between approximately July and October 2019, Lewis breached his duty by illegally tipping material nonpublic information that he had learned from the Officer to Carter, O'Connor, and Waugh, who then traded on the basis of that information.

4.      More specifically, in July 2019, the Officer informed Lewis that a company in which the Fund had a substantial investment ("Issuer A") would be raising capital through a Private Investment in Public Equity ("PIPE") offering.  A PIPE offering is a private placement of securities of an already public company that is typically offered to a limited group of institutional accredited investors.  This is a type of transaction that, in the biotechnology sector, frequently results in an increase in share price.  Lewis, who was bound by a confidentiality agreement not to share information about the transaction, tipped Carter this material nonpublic information when they met in a luxury hotel room the same day Lewis learned the information.  Within three hours of their meeting at the hotel, she bought over $700,000 worth of Issuer A's common stock.  After Issuer A announced its capital raise the next day, its share price increased by approximately 34.4%, and Carter profited by over $172,000.

5.     Additionally, in September 2019, the Officer was staying aboard Lewis' yacht when the Officer learned of positive results from a clinical trial related to a cancer drug being developed by "Issuer B," another public company in which the Fund and Lewis each had substantial investments.  The Officer, who sat on Issuer B's board of directors, also learned that the company may present these results at a conference at the end of October 2019 (the "October Biotech Conference").[1]  Lewis was also on his yacht when the Officer learned this information, he met with the Officer at that time, and the Officer shared material nonpublic information about Issuer B with Lewis.  Lewis understood that the Officer expected Lewis to maintain this information's confidentiality.

6.     In breach of his duty of trust and confidence, Lewis then tipped Carter, O'Connor, and Waugh this inside information about Issuer B.  Within days of the Officer learning this information, Carter and then later O'Connor and Waugh purchased Issuer B's common stock based on that tip.

7.     Together, these three tippees bought over $3 million worth of Issuer B's stock.  And in O'Connor and Waugh's case, each used a $500,000 loan extended by Lewis to execute the trades.  To execute some of his trades, O'Connor used a brokerage account held by his wife, Jean J. O'Connor.  The day after Issuer B announced positive data from its clinical trial at the October Biotech Conference, its share price increased by 16.7%, and Carter, O'Connor, and Waugh together profited by over $373,000.

**VIOLATIONS**

8.     By virtue of the foregoing conduct and as alleged further herein, Defendants violated U.S. insider trading prohibitions, in particular, Section 10(b) of the Securities Exchange

---

[1] The conference name has been anonymized in this Complaint.

Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

9.    Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

### NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.    The Commission brings this action pursuant to authority conferred upon it by Sections 21A of Exchange Act [15 U.S.C. § 78u-1].

11.    The Commission seeks a final judgment: (a) permanently restraining and enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they violated; (b) ordering Defendants and the Relief Defendant to disgorge any ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Exchange Act Section 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), (d)(5) and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; and (d) ordering any other further relief that the Court may deem just and proper.

### JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].

13.    Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14.    Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa(a)].  More specifically, certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by making use of the means, instruments, or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange.  As detailed below, orders and executions of securities transactions described herein involved securities listed on stock exchanges located within this District, and the Defendants also used correspondent banks in this District to clear U.S. dollar transfers that they initiated as part of their unlawful schemes.

## DEFENDANTS

15.    **Joseph C. Lewis**, age 86, is a British citizen who resides principally in The Bahamas.  He is the ultimate majority owner of the Fund, and is the sole indirect owner, president, and a director of the Fund's manager, "Fund Management Inc."

16.    **Carolyn W. Carter**, age 33, is a U.S. citizen who resides in the U.S. Virgin Islands.  Carter and Lewis were in a romantic relationship from approximately 2013 to 2020.

17.    **Patrick J. O'Connor**, age 66, is a U.S. citizen who resides in New York.  O'Connor is one of Lewis' private jet pilots.

18.    **Bryan L. Waugh** (a/k/a Marty Waugh), age 64, is a U.S. citizen who resides in Virginia.  Waugh is one of Lewis' private jet pilots.

## RELIEF DEFENDANT

19.    **Jean J. O'Connor**, age 66, is a U.S. citizen who resides in New York.  She is Patrick O'Connor's wife.  Patrick O'Connor's unlawful trading activity was conducted, in part, through a brokerage account held by Jean J. O'Connor.

## RELEVANT ENTITIES[2]

20.     **Investment Group** is Lewis' private investment organization, which has investments in over 200 operating companies.  Its principal place of business is in Florida.

21.     **The Fund** is a Delaware limited liability company with its principal place of business in California.  The Fund's limited liability company manager is Fund Management Inc.

22.     **Fund Management Inc.** is a Bahamian company with its principal place of business in The Bahamas.  It is the manager of the Fund.  At all relevant times in this Complaint, Lewis was the sole indirect owner, president, and a director of Fund Management Inc.

23.     **Issuer A** is a Delaware corporation with its principal place of business in Massachusetts.  Shares of its common stock are registered with the Commission pursuant to Section 12(b) of the Exchange Act and trade on the Nasdaq Global Select Market, which is located in this District.

24.     **Issuer B** is a Delaware corporation with its principal place of business in California.  Shares of its common stock are registered with the Commission pursuant to Section 12(b) of the Exchange Act and trade on The Nasdaq Stock Market LLC, which is located in this District.

## TERM USED IN THIS COMPLAINT

25.     **PIPE Offering:**  Private Investment in Public Equity ("PIPE") refers to the private placement of securities of an already public company, typically offered to a limited group of institutional accredited investors.  The public company typically allows potential PIPE investors to view material nonpublic information before deciding whether to invest.  This

---

[2] The entities' names have been anonymized in this Complaint.

requires the potential investor to agree to maintain the confidentiality of information shared by the company and to cease or restrict the investor's trading in the company's securities.

## FACTS

### I.  Lewis was Entrusted with Material Nonpublic Information and Knew That He Had a Duty to Maintain its Confidentiality

26.     Lewis is the founder of and principal investor in Investment Group, a firm that invests in operating companies around the world.  At all relevant times, Lewis had a substantial investment in the Fund, which he helped found in 2005 with an investment of approximately $5.7 million, and which is held out as being a part of Investment Group.  By the end of June 2019, the Fund held assets exceeding $1 billion, and it had major equity investments in dozens of publicly traded biotechnology companies.

27.     From no later than February 28, 2017 through at least October 29, 2019, Lewis was president, treasurer, secretary, and a director of Fund Management Inc., in addition to being its sole indirect owner.  Because Fund Management Inc. owned a majority of the Fund's membership interests and was also the Fund's manager under its limited liability company operating agreement, Lewis had ultimate control over the Fund.  Moreover, Fund Management Inc., including Lewis and its other officers and directors, owed a duty of trust and confidence to the Fund and its other shareholders.

28.     Due to its major investments in biotechnology companies, the Fund sometimes had a contractual right to appoint members of certain public companies' boards of directors.  In these director roles, the Fund's officers received material nonpublic information about these companies.  The Fund was also invited to participate in PIPE offerings of certain public companies, which allowed its officers to review the public companies' material nonpublic information pursuant to confidentiality agreements.

29.     Due to his role with the Fund, Lewis was often privy to material nonpublic information.  Further, officers of the Fund also shared with Lewis material nonpublic information they learned as public company directors or pursuant to PIPE offerings.  In these situations, Lewis typically owed a duty of trust and confidence to the source of the information, including as a result of a confidentiality agreement between the Fund and the company, and/or he owed a duty of trust and confidence to the officer of the Fund who shared material nonpublic information with him in confidence.

30.     Further, Lewis was well aware of his duties of trust and confidence.  Indeed, the Officer informed Lewis on numerous occasions prior to July 2019 that Lewis was not to share any material nonpublic information that he learned from the Fund's officers.  The Officer also directed Lewis to first inform the Fund prior to purchasing or selling equity securities (stock) in biotechnology companies because the Fund could have material nonpublic information about the biotechnology company whose stock Lewis wished to trade.

31.     Lewis never challenged or questioned the Officer's warnings about not sharing material nonpublic information, nor did he indicate that he misunderstood them.  Indeed, Lewis' personal trader, who bought and sold equity securities and other financial assets for Lewis and Lewis-controlled entities, gave the appearance of honoring the Officer's request to Lewis by frequently informing the Fund's officers and employees of biotechnology securities that Lewis wished to trade.  Despite the Officer's warnings about Lewis' duty of confidentiality, Lewis chose to breach his duty when he tipped material nonpublic information obtained from the Officer about Issuers A and B to the other Defendants.  As further explained below, on each occasion, Lewis knew, consciously avoided knowing, or was reckless in not knowing the

information he communicated to Carter, O'Connor, and Waugh was material and nonpublic, and that his communications breached his duty of trust and confidence.

## II.  Lewis Illegally Tipped Material Nonpublic Information about Issuer A to Carter, Which Carter then Illegally Traded Upon

### A.  Lewis and Carter Had a Close Personal Relationship, Which Made Carter Aware That Lewis Was Entrusted with Material Nonpublic Information

32.  Lewis and Carter were in a close romantic relationship from approximately 2013 to 2020.  Carter moved in with Lewis in 2015 or 2016.  He frequently gave her gifts, including cash transfers amounting to approximately $100,000 per year.

33.  Lewis also took an active interest in Carter's investing.  Indeed, Lewis provided Carter with the funds that she used to open an account with Broker 1 in November 2016.  He then often guided Carter's investment strategy.  For instance, he encouraged Carter's first trade on March 15, 2017, which was the purchase of a biotechnology stock.  And between her first trade in March 2017 and the end of October 2019, Carter only ever traded in stocks in which the Fund and/or Lewis had invested.  Indeed, Carter sometimes emailed Lewis when one of these companies—including Issuer B—did particularly well or poorly on a given trading day.

34.  Lewis also kept Carter informed about companies in which the Fund had invested. In particular, from no later than April 2017 through at least April 2020, Lewis often forwarded and directed the forwarding of confidential emails and attachments to Carter, including the Fund's portfolio statements and confidential analyses of companies in its investment portfolio. These portfolio statements showed all of the companies in which the Fund was invested, including the number of shares and percentage of each company that the Fund owned.  Lewis shared these statements with Carter, even though the Officer had told him they were confidential and must not be shared.

35.     Many of the emails and attachments that Lewis forwarded or directed be forwarded to Carter included confidentiality markings, such as "CONFIDENTIAL | NOT FOR DISTRIBUTION" and "This email message is for the sole use of the intended recipient(s) and may contain confidential information."  Lewis and those acting at his direction never copied the Officer nor any other officers or employees of the Fund when forwarding these materials to Carter.

36.     Further, because Lewis and Carter were romantically involved, she was regularly with Lewis on his yacht and elsewhere.  Over the years, Carter was present when Lewis met with the Fund's officers, including the Officer, and biotechnology company executives.

37.     Thus, Carter knew, was reckless in not knowing, or consciously avoided knowing that Lewis' role at the Fund meant he was entrusted with material nonpublic information.

B.      <u>Lewis Tipped Material Nonpublic Information about Issuer A to Carter, Which Carter Then Traded Upon</u>

38.     In 2019, Lewis tipped material nonpublic information to Carter on at least two occasions.

39.     On the first occasion, on or about July 18, 2019, an investment banker for Issuer A informed the Officer that Issuer A intended to conduct a PIPE offering and asked if the Fund wished to participate.  As part of the PIPE offering, Issuer A would share nonpublic information with the Fund before the Fund decided whether to invest.  The next day, the Fund entered into a confidentiality agreement with respect to the PIPE offering ("PIPE Confidentiality Agreement"), which prohibited the Fund, including its "affiliates, directors, officers, employees, agents or advisors," from sharing the existence or terms of the PIPE offering.  As president, director, and sole indirect owner of the Fund's manager, Lewis was bound by this confidentiality agreement.

40.     Lewis learned of Issuer A's PIPE offering no later than July 25, 2019, when he and Carter were staying at a luxury hotel in South Korea.  The Officer informed Lewis via email of Issuer A's PIPE offering and the Fund's allocation therein.

41.     The Officer had specifically counseled Lewis in the past to treat as confidential any nonpublic information concerning issuers' financing events.  Accordingly, Lewis knew, consciously avoided knowing, or was reckless in not knowing that he had a duty of trust and confidence as to the PIPE offering, and that the offering's existence constituted material nonpublic information.

42.     Lewis also knew that the Fund had signed confidentiality agreements in connection with prior issuer financings, and that he had been bound by those agreements as an officer and director of the Fund's manager.  Therefore, Lewis either knew, consciously avoided knowing, or was reckless in not knowing that he had a duty of trust and confidence regarding the PIPE offering.

43.     On July 25, 2019, approximately seven hours after Lewis received the Officer's email, Carter emailed Lewis to suggest they get room service for dinner, and that she come to his hotel room.  Three hours after they were scheduled to meet in Lewis' hotel room, Carter made a purchase order for 150,000 shares of Issuer A at a price of $700,673.23, or approximately $4.67 per share.

44.     During their evening meeting, Lewis tipped Carter material nonpublic information regarding the PIPE offering for personal benefit, including the benefit of making a gift of material nonpublic information to his girlfriend.  Lewis also knew, consciously avoided knowing, or was reckless in not knowing that the information he communicated to Carter about the PIPE offering would be used for trading.

11

45.  After Carter traded on the material nonpublic information provided by Lewis, 99% of her brokerage account value was invested in Issuer A.  Further, prior to this trade, Carter had never traded in Issuer A, and she has not traded in it since selling her 150,000 Issuer A shares in September 2019.

46.  The next day, Issuer A announced a $60 million private placement in which several institutional investors, including the Fund, participated.  That day, Issuer A closed at $5.82 per share—approximately 34.4% higher than the previous day's close of $4.33 pershare. Its trade volume on the first trading day after the announcement was approximately 6.66 times higher than its 15-day simple moving average trade volume.

47.  When Carter sold her Issuer A shares in September 2019, she realized a profit of approximately $172,326 from the July 26, 2019 price increase.  Her total profit was approximately $888,775, due to Issuer A share price movements that took place after July 26, 2019.

48.  Carter knew, consciously avoided knowing, or was reckless in not knowing that the PIPE offering was material nonpublic information, and she used this information to trade in Issuer A.  First, and most importantly, she knew, consciously avoided knowing, or was reckless in not knowing that Lewis had this information because of the Fund's ownership interest in Issuer A.  More specifically, earlier that same month, Carter received the Fund's portfolio statement, which indicated that the Fund owned approximately 9.9% of Issuer A.  Second, Carter was aware that PIPE offerings had a positive impact on biotechnology companies because she had previously purchased shares of a biotechnology company (Issuer B) just prior to a PIPE offering, and those shares also saw a substantial increase in value just after the offering's announcement.  Third, Carter's unusual trading activity and the commitment of 99% of her

brokerage account assets to this investment indicate she knew the importance of this information to the market.

49.     Finally, Carter knew, consciously avoided knowing, or was reckless in not knowing that Lewis breached a duty of trust and confidence for personal benefit by providing her with information about the PIPE offering.  First, Carter was aware of Lewis' high-level role in the Fund and she had been been privy to numerous emails from Lewis containing information marked as confidential.  Second, she also knew of Lewis' major investment in Issuer A through the Fund, and that Lewis often met with executives of companies in which he invested.  And as Lewis's direct tippee, Carter was of course aware of the personal benefit Lewis received from giving her—his romantic partner—a gift of inside information about the PIPE offering.

### III.   Lewis Illegally Tipped Material Nonpublic Information About Issuer B to Carter, O'Connor, and Waugh, Which They Each Then Illegally Traded Upon

50.     A few weeks after Lewis breached his duties of trust and confidence to Issuer A and the Officer by illegally tipping Carter, Lewis did it again—but this time, he illegally tipped not just Carter but also his longtime private pilots, O'Connor and Waugh.  All three Defendants took advantage of material nonpublic information provided by Lewis concerning Issuer B, and together profited by over $373,000.

A.   The Officer Provided Material Nonpublic Information about Issuer B to Lewis Pursuant to Their Longstanding Relationship of Trust and Confidence

51.     In August 2019, the Officer, who was a member of Issuer B's board of directors, emailed Lewis his view that Issuer B's share price would remain between $80 and $120 until it publicized clinical trial data showing that it could be competitive with another biotechnology company that was developing a similar trial drug.

52.     In September 2019, the Officer learned that a patient in a clinical cancer trial had experienced positive results from Issuer B's trial drug.  On September 11, 2019, for instance,

Issuer B's CEO emailed the Officer and other board members that one patient had experienced a "PR"—a partial response, meaning that the patient's tumor had shrunk by over 30% after being dosed with the trial drug.  The Officer responded minutes later:  "Great initial read at that dose!"  Other board members responded "Agree!" and "Great news, [CEO]."

53.     Then, on September 17, 2019, Issuer B's CEO emailed the Officer a scan showing a clear and dramatic shrinkage of the trial patient's tumor, along with the message, "Test your radiological skills on this one. . . .  Obviously also had dramatic symptom improvement."  In this same email, the CEO also suggested presenting clinical data at the October Biotech Conference.  As a member of the board of directors, the Officer owed a duty of trust and confidence to Issuer B with respect to this and other information he received in that capacity.

54.     The Officer was a guest aboard Lewis' yacht from September 11 to 13, and again from September 15 to 18, 2019, when the Officer learned of the confidential positive news about Issuer B's clinical trial results for its cancer drug.  And shortly after the Officer received the email from Issuer B's CEO on September 11, the Officer had dinner with Lewis and another Investment Group officer aboard the yacht.  At the dinner, all three were optimistic about Issuer B's future and the prospects for its cancer drug.  During the dinner, Lewis and/or the Investment Group officer suggested Issuer B's share price, which had generally been trading between $80 and $90 for the previous two weeks, might trade up to the mid-100s.  The Officer responded by stating that the share price might rise to over $200, which was well above the $80 to $120 range in the Officer's August 2019 email to Lewis.  At the dinner, the Officer conveyed material nonpublic information about Issuer B's clinical trial to Lewis.  Either that night or later that week, the Officer and Lewis also discussed the possibility that Issuer B would present results from its trial at the October Biotech Conference.  Lewis knew, based on prior conversations with

the Officer, that the Officer would urge Issuer B to present trial results only if the data were positive.

55.      Additionally, Lewis and the Officer were both aboard Lewis' yacht on September 17, 2019, after Issuer B's CEO had earlier that day emailed the Officer about the trial patient's tumor size reduction and suggested presenting clinical data at the October Biotech Conference.

56.      When the Officer shared confidential and material nonpublic information with Lewis, Lewis knew that the Officer was a member of Issuer B's board of directors and that the Officer was entrusted with inside information because of the Officer's role.  Further, Lewis also knew that the Officer had for years shared inside information with Lewis because of Lewis' role with the Fund and Lewis' associated duty of trust and confidence to both the Fund, including information about the Fund and the issuers in which the Fund invested, and to the Officer. Indeed, the Officer had on numerous occasions informed Lewis that Lewis was not to share any material nonpublic information that he learned from the Officer and other officers of the Fund about any issuer in which the Fund invested.  Lewis and the Officer had a history, pattern, or practice of sharing confidences, such that the Officer expected Lewis to maintain this information's confidentiality, and Lewis was aware that the Officer expected Lewis to maintain this information's confidentiality.  Therefore, Lewis either knew, consciously avoided knowing, or was reckless in not knowing that he had a duty of trust and confidence to the Officer with respect to any such information.

57.      Moreover, based on Lewis' previous investments in biotechnology companies, Lewis was aware that share prices often increased after a company announced positive clinical results.  And Lewis was aware that these clinical results had not been publicly announced.  Thus,

Lewis knew, consciously avoided knowing, or was reckless in not knowing that the Officer's statements to him about Issuer B constituted material nonpublic information.

      B.    <u>Lewis Tipped Carter with Material Nonpublic Information About Issuer B and Carter Traded on that Information</u>

      58.    Shortly after Lewis' meetings with the Officer aboard his yacht, Lewis tipped Carter with the material nonpublic information about Issuer B that he had learned from the Officer. In so doing, he violated his duty of trust and confidence to the Officer. Lewis tipped Carter for personal benefit, including the benefit of making a gift of material nonpublic information to his girlfriend. Lewis also knew, consciously avoided knowing, or was reckless in not knowing that the information he communicated to Carter about Issuer B and the positive clinical trials would be used for trading.

      59.    Indeed, on September 17, 2019, approximately 90 minutes after the Officer received the second email from Issuer B's CEO, Carter entered a note on her phone, which she subsequently modified on September 19:

> "Sell at 15% at the volume until 150,000 shares are sold" - call Joe after the [Broker 1] call
> 10,360 volume
> @ $10.50
> Done @1:45pm in a perfect world
> I have an order to sell @15% of the volume
> I would like to change it to 25% of the volume
> With a $9.50 low
> 125K
> [Issuer B]: buy at 15% of the volume, cap @$90.00
> [Issuer A]: sell at 15% of the volume, low @$9:50

In Carter's notes, "Joe" was a reference to Lewis. "Broker 1" was the name of the brokerage where Carter held an account.

      60.    On September 18, Carter logged into her Broker 1 electronic account portal, called Broker 1, and asked to sell all Issuer A shares in her account. She told the Broker 1

representative, "I'd like to do 15% of the volume until everything is sold." She was advised to call back about 30 minutes later when the market was open. She did so while simultaneously logged into her Broker 1 account portal, and repeated over the phone that she wished to sell her Issuer A shares, adding "I'd like to trade 15% of the volume until all 150,000 shares are sold."

61.    Carter's request to sell her shares at 15% of the daily trade volume of Issuer A is a strategy sometimes used by sophisticated investors to sell large quantities of securities with minimal or no reduction in the securities' sale price.

62.    Consistent with the note in her phone, Carter later asked Broker 1 to change her sale order from 15% to 25% of the daily trade volume.

63.    Broker 1 complied with Carter's trade order, and began selling Carter's 150,000 Issuer A shares shortly after the market opened on September 18. Several minutes after Broker 1 began executing Carter's Issuer A trade order, she emailed Lewis: "Good morning! All good & all confirmed."

64.    The last of Carter's Issuer A share sales were completed shortly before market close on September 19. Her total proceeds from these sales was approximately $1,551,856. Carter used the bulk of her sale proceeds—approximately $1,449,330—to buy shares of Issuer B from September 19 to 20, 2019. As with her Issuer A sales, she followed Lewis' instructions to conduct a market volume purchase of Issuer B shares. On September 25, Carter bought an additional $17,700 worth of Issuer B shares.

65.     On September 30, 2019, Carter called Broker 1 to ask whether she could buy Issuer B shares on margin.[3]  Carter, however, was told by a Broker 1 representative that Issuer B shares were effectively excluded from margin trading.

66.     Undeterred, Carter bought approximately $23,781 worth of Issuer B stock on September 30 using money she had transferred to her brokerage account three days earlier.  By this time, Carter had spent approximately $1,490,811 purchasing Issuer B stock—over 99% of her brokerage account value and a significant portion of her overall net worth.

67.     When Carter executed her trades using information received from Lewis, she knew, consciously avoided knowing, or was reckless in not knowing that the information about Issuer B and the positive clinical trials was material and nonpublic, and that Lewis breached a duty of trust and confidence for personal benefit when he provided her with material nonpublic information.  First, Carter had just a few weeks prior illegally purchased Issuer A stock under similar circumstances.  Second, she also, in the past, purchased Issuer B's stock on three separate occasions just prior to the release of information resulting in a rise in Issuer B's stock price.  Thus, Carter understood the impact that positive press releases can have on Issuer B's stock price when released.  Third, the timing, unusual trading, and the extent of Carter's investment in Issuer B reflects that she knew the importance of the information Lewis provided to her.  Finally, Carter knew that Lewis was essentially the Officer's employer, that Lewis frequently received significant information about various issuers from the Officer, that the Officer was on Issuer B's board of directors, and that Lewis frequently forwarded to Carter confidential emails and

---

[3] Buying shares on margin means that an account holder borrows money from the brokerage, which then uses the money to conduct the stock purchase.  The account holder must pay back the margin loan whether the share price increases or decreases, making this a risky method of funding stock trading.

attachments he had received from the Officer.  And as Lewis's direct tippee, Carter was of

course aware of the personal benefit Lewis received from giving her—his romantic partner—a

gift of inside information about Issuer B and the positive clinical trials.

C.    Lewis Tipped O'Connor and Waugh with Material Nonpublic Information About
      Issuer B

68.    A few weeks after learning material nonpublic information about Issuer B from

the Officer, Lewis tipped his longtime private pilots, O'Connor and Waugh, with this

information.  In so doing, he violated his duty of trust and confidence to the Officer.  Lewis

tipped O'Connor and Waugh for personal benefit as a gift and/or as part of a *quid pro quo* for

direct or indirect pecuniary gain as a substitute for providing a formal retirement plan for his

pilots.  Lewis also knew, consciously avoided knowing, or was reckless in not knowing that the

information he communicated to O'Connor and Waugh about Issuer B would be used for

trading.

*i. Lewis was committed to helping O'Connor and Waugh with their investments*

69.    O'Connor and Waugh began working as Lewis' private jet pilots in 2005 and

2001, respectively.

70.    Starting no later than November 2016, Lewis began providing investment advice

to both O'Connor and Waugh.  Lewis had numerous and sometimes lengthy conversations with

O'Connor and Waugh concerning stock trading, and they acted on his advice.  For example, at

the end of October 2016, Lewis invited O'Connor and Waugh to speak with him about

companies to invest in.  Following this conversation, O'Connor and Waugh reported to Lewis'

assistant the dollar amounts they wished to invest in specific companies.  And in December

2016, a company controlled by Lewis loaned O'Connor and Waugh $80,000 and $50,000,

respectively.  At the end of December 2016, O'Connor and Waugh invested $48,675.25 and $18,766.86, respectively, in the companies Lewis had recommended, including Issuer B.

71.     Lewis' investment advice to O'Connor and Waugh continued for years.  In numerous WhatsApp messages written between 2017 and 2020, O'Connor described the investment advice he and Waugh received from Lewis, which frequently included Lewis' recommendations to buy specific stocks at specific times.

72.     One such stock included an Australian company of which Lewis owned over 40%.  Although Lewis had recommended in or about October 2018 that O'Connor and Waugh buy stock in this company, it suffered a setback in early 2019.  After Lewis' board appointees at this company contacted Lewis to inform him of this information, and just hours after a board meeting concerning a planned press release about the setback, Lewis called O'Connor and O'Connor immediately attempted to sell all his shares.  However, O'Connor was unable to sell his shares before the company issued a press release about the setback, which was followed by a stock price drop.  Further, approximately thirty minutes after the call, Waugh too attempted to sell his shares, but also failed to avoid the stock price drop.  O'Connor's encrypted communications confirm that he believed Lewis provided him material and nonpublic information with the expectation that O'Connor would sell his shares in the company.

73.     In addition to providing investment advice and confidential information to O'Connor and Waugh, Lewis also provided them with financial assistance.  On at least twelve occasions from 2013 to 2019, Lewis loaned five- and six-figure sums to them, which often funded their stock trading.  These were frequently "non-recourse" loans, meaning that the lender could not take legal action to seek repayment if the borrower defaulted.

74.     According to Waugh, Lewis provided the foregoing assistance to him and O'Connor, in part, to make up for their lack of a formal retirement plan through their employer, which was a part of Investment Group.

75.     Further, in addition to their investment conversations with Lewis, O'Connor and Waugh also frequently emailed each other about stocks, including the stocks that Lewis had discussed with them.  In their jobs as private jet pilots, O'Connor and Waugh typically traveled about 200 days per year, during which they flew together.  Their flights were often hours long, giving them ample opportunity to speak with each other about investing and other topics.

ii. *Lewis provided material nonpublic information about Issuer B to O'Connor and Waugh*

76.     O'Connor and Waugh flew Lewis from San Diego, California, to The Bahamas on October 10, 2019.  During that flight, Lewis tipped O'Connor and Waugh the material nonpublic information about Issuer B that he had learned from the Officer the previous month.

77.     Later that same evening, after receiving the tip from Lewis, O'Connor emailed to request that Broker 2 "place a buy order for [Issuer B] at market value" and that there was "[m]ore money coming your way next week to invest in [Issuer B]."  By the following day, O'Connor had purchased $204,080 worth of Issuer B stock.

78.     Just two minutes after emailing his broker at Broker 2, O'Connor entered an order to sell all shares of Issuer A in the Broker 3 account of his wife, Jean J. O'Connor.  Five minutes later, Patrick O'Connor entered an order to sell all his shares of Issuer A in his and Jean J. O'Connor's joint account with Broker 4.  The shares in both accounts were sold the following morning for total proceeds of approximately $114,720.  Shortly afterwards, O'Connor entered an order with Broker 3 to buy another approximately $103,289 worth of Issuer B shares, and a separate order with Broker 4 to buy approximately $7,594 worth of Issuer B shares.

79.    Further, also on the evening of October 10, O'Connor messaged an acquaintance,

"Individual 1," via an encrypted mobile app.  He wrote that he had spoken with Lewis earlier

that day, and he then advised Individual 1 to sell all of his shares of Issuer A and "buy as much

[Issuer B] as you can."  They continued:

| O'CONNOR: | Spoke to boss today in length |
| INDIVIDUAL 1: | Ok, [Issuer A] is done… |
| O'CONNOR: | No. [Issuer A] not done but we will make much more within the next 6 weeks with [Issuer B]. |
| INDIVIDUAL 1: | Ok, understood |
| O'CONNOR: | Boss said he really really likes [Issuer B] right now. Think we have people who know Get it done amigo. |

\* \* \*

| INDIVIDUAL 1: | Thanks for advice me Amigo! [*sic*] |
| O'CONNOR: | No worries amigo. Boss said to bug him more. He forgets about us Today he approached me though so this is another goodie. |

This six-week timeframe O'Connor mentioned in his message encompassed the October Biotech

Conference.

80.    Several days later, O'Connor again messaged with Individual 1 via an encrypted

mobile app:

| O'CONNOR: | You okay with [Issuer B] Boss is helping us out and told us to get ASAP |
| INDIVIDUAL 1: | 🙌🙌🙌🙌[4] Put big money last friday |
| O'CONNOR: | Perfect All conversation on app is encrypted so all good. No one can ever see |

---

[4] We note the emojis used in the conversation have a slightly different appearance in the messaging application that was used.

81.     Waugh also moved quickly on Lewis' tip, placing an order with Broker 2 to buy $88,010 worth of Issuer B shares on October 11, 2019, the day after he flew Lewis to The Bahamas.

82.     On October 13, 2019, Lewis' executive assistant emailed bank wire instructions. Two of the instructions were for a transfers of $500,000 each to O'Connor and Waugh.  In her transmittal email, Lewis' assistant described these as "Loan to Patrick and Marty as discussed on the flight over on Thursday."  Lewis signed the bank wire instructions himself.

83.     A few days later, on October 15, 2019, $500,000 was wired into O'Connor's account at a bank based in New York and $500,000 into Waugh's account at a bank based in North Carolina, both from an account controlled by Lewis at a Switzerland-based financial institution.  These bank wires were transferred through a correspondent bank in this District.  On that same day, O'Connor used the encrypted mobile app to inform Individual 1 that Lewis said to buy Issuer B stock, but that Issuer B "should only be short term," and that the "Boss mentioned around 6 to 8 weeks for [Issuer B] to take profit."

84.     And on October 16, 2019, Waugh's broker entered a client call note:  "[Waugh] called me yesterday and told me to transfer in $250,000 from his [bank] account to his brokerage account and us[e] it to purchase as many share of [Issuer B] as possible.  I inputted the transfer and will make the trade this morning."  That day, Waugh's account with Broker 2 bought approximately $250,494 worth of Issuer B stock.

85.     The morning of October 17, 2019, Issuer B announced that it would take part in the October Biotech Conference.  That day, Issuer B's share price closed approximately 8.3% above the previous day's closing price.  A little over a week later, on October 25, Waugh sold some Issuer B shares in his Broker 2 account for a net profit of approximately $3,409.

86.     On October 21, 2019, Waugh sold shares of Issuer A for approximately $139,240 and used the sale proceeds to fund his purchase of more Issuer B stock.  On October 25, 2019, Waugh sold shares of an index fund for approximately $99,766 and used the sale proceeds to fund his purchase of more Issuer B stock.

87.     Then, on October 22, 2019, O'Connor again messaged Individual 1 via an encrypted mobile app: "28th is a big day for [Issuer B]".  O'Connor was referring to the October Biotech Conference, which was held on October 28, 2019, and is when Issuer B first announced data from its clinical trial.  The encrypted conversation continued:

| | |
|---|---|
| O'CONNOR: | Think the Boss has inside info. Otherwise why would he make us invest. |
| * * * | |
| INDIVIDUAL 1: | What's your target price to sell? |
| O'CONNOR: | Not sure. |
| | Well over $100 |
| | 52 week high I think is $112 |
| INDIVIDUAL 1: | Yes... |
| O'CONNOR: | No worries. |
| | We won't dump on the 28th. |
| | You can relax. |
| * * * | |
| O'CONNOR: | Boss lent [Waugh] and I $500,000 each for this. [I'm] pretty sure he knows the outcome |
| INDIVIDUAL 1: | Wow!!!! |
| | He really loves you! |
| O'CONNOR: | He told me to buy |
| | And asked if I had spare cash |
| | I said all invested and I need him. |
| | I was like a little puppy looking up at him.  He couldn't refuse |
| | [Waugh] just holds on and says I got big balls |
| * * * | |
| INDIVIDUAL 1: | He must be sure you will make good money, or at least dont loose all [*sic*] |

O'CONNOR:          BINGO.

88.     On October 26, 2019, O'Connor emailed Waugh a link to Issuer B's press release that it would be presenting clinical data at the October Biotech Conference.

89.     From the time of their October 10 flight with Lewis until October 27, 2019—the day before Issuer B announced its clinical data at the October Biotech Conference—O'Connor bought approximately $819,531 worth of Issuer B stock and Waugh bought approximately $761,527 worth of Issuer B stock.  This represented several years' worth of salary for both pilots.

90.     As to their Issuer B stock purchases through Broker 2, O'Connor and Waugh both entered stop-loss orders, which is a risk-mitigation mechanism that would cause their Issuer B stock to be sold automatically if its share price fell below a certain price.  On October 28, 2019, the stop-loss order was triggered in both O'Connor's and Waugh's accounts when Issuer B's share price temporarily fell below approximately $79.00 several minutes after markets opened.  Thus, all the Issuer B shares in O'Connor's Broker 2 account were sold at an average price of approximately $76.74 per share, and all Issuer B shares in Waugh's Broker 2 accounts were sold at an average price of approximately $76.28 per share.

91.     Within several hours of the stop-loss orders being triggered, both O'Connor and Waugh had used all or almost all the proceeds from their stop-loss sales to repurchase Issuer B shares.  This was several hours before Issuer B made its announcement of clinical data.

92.     When they purchased Issuer B stock between October 10 and October 28, 2019, O'Connor and Waugh both knew that Lewis controlled Investment Group, and that representatives of Investment Group sat on Issuer B's board of directors.  For instance, on January 10, 2018, Waugh sent O'Connor an email with a subject line that included Issuer B's stock ticker symbol:  "Looks like two [Investment Group] guys are on the board."  He emailed

O'Connor later the same day: "Also wonder what the boss thinks about reinvesting in [Issuer B]." And as both were directly tipped by Lewis, O'Connor and Waugh were of course aware of the personal benefit Lewis received from gifting them this inside information, as well as their *quid pro quo* of communicating inside information to his pilots as a substitute to providing them a formal retirement plan. Accordingly, both O'Connor and Waugh knew, consciously avoided knowing, or were reckless in not knowing that the information Lewis provided them had been obtained in breach of a duty of trust and confidence for personal benefit.

93. Moreover, the timing, unusual trading, and the extent of O'Connor and Waugh's investments in Issuer B reflects that both knew, consciously avoided knowing, or were reckless in not knowing that the information to be contained in Issuer B's announcement, which would positively affect the stock price, was material nonpublic information, and that they used this information to trade in Issuer B. Further, O'Connor, in his messages above, explicitly recognized the inside nature of the information when he stated "Think the Boss has inside info. Otherwise why would he make us invest." He also recognized that his communications concerned illegal activity, when he stated "All conversation on app is encrypted so all good. No one can ever see." Finally, both O'Connor and Waugh had previously attempted to use their prior knowledge of confidential information provided by Lewis to avoid losses in their Australian investment. Both therefore understood the impact important material and nonpublic information can have on share prices, when disclosed publicly.

94. After stock markets closed on October 28, 2019, Issuer B announced positive data from the clinical trial of its principal experimental cancer therapy at the October Biotech Conference. The following day, Issuer B's share price closed at $95.10—approximately 16.7%

higher than the previous day's closing price—and traded on volume exceeding 3.53 times its 15-day simple moving average trade volume.

95.     In November 2019, both O'Connor and Waugh repaid Lewis the principal amount on their $500,000 loans, but without interest.  Waugh emailed Lewis' assistant a receipt showing the transfer of funds back to Lewis; the file name he gave to the receipt was "500000 loan payback for [Issuer B].pdf."

96.     From November 1 to December 6, 2019, Carter sold 16,400 shares of Issuer B for proceeds of $1,707,904, realizing a net profit of $217,092.  Of this net profit, $68,828 is attributable to the share price increase immediately following Issuer B's announcement on October 28, 2019.

97.     From November 1 to November 8, 2019, O'Connor sold 10,425 shares of Issuer B for proceeds of $1,046,577, realizing a net profit of $227,060.  Of this net profit, $171,886 is attributable to the share price increase immediately following Issuer B's announcement on October 28, 2019.

98.     From October 28 to November 11, 2019, Waugh sold 9,380 shares of Issuer B for proceeds of $925,672, realizing a net profit of $251,166.  Of this net profit, $132,507 is attributable to the share price increase immediately following Issuer B's announcement on October 28, 2019.

99.     Based on their close interaction with Lewis, each tippee Defendant knew, consciously avoided knowing, or was reckless in not knowing that Lewis (1) was entrusted with material nonpublic information and (2) had a duty of trust and confidence.  All three trusted Lewis' tipped inside information and invested a significant share of their personal wealth,

precisely because they believed Lewis was ahead of the market and had provided them with material nonpublic information.

IV.   **Jean J. O'Connor Received Ill-Gotten Gains From Defendants' Illegal Conduct to Which She Has No Legitimate Claim**

100.   Jean J. O'Connor held the Broker 3 account in her own name and held the Broker 4 account jointly with Patrick O'Connor.  Accordingly, she received approximately $141,871 of ill-gotten profits, which are directly attributable to Patrick O'Connor's unlawful conduct described herein, and she has no legitimate claim to those funds.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Thereunder (All Defendants)**

101.   The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 100.

102.   By engaging in the conduct described above, Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly and recklessly have (i) employed one or more devices, schemes, or artifices to defraud; (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts, necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in one or more acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

103.   By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)].

## SECOND CLAIM FOR RELIEF
### Other Equitable Relief, Including Unjust Enrichment and Constructive Trust
### (As To Relief Defendant Jean J. O'Connor)

104.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 100.

105.    Pursuant to Exchange Act Sections 21(d)(3), (5), (7) [15 U.S.C. §§ 78u(d)(3), (5),

(7)], the Commission is authorized to seek and any Federal court may order disgorgement.

106.    Relief defendant Jean J. O'Connor has received and possesses ill-gotten funds

derived from unlawful acts or practices of her husband Patrick J. O'Connor dictating that, in

equity and good conscience, she should not be allowed to retain such funds.

107.    Jean J. O'Connor has no legitimate claim to this property.

108.    As a result, Jean J. O'Connor is liable for unjust enrichment and should be

required to return her ill-gotten gains, in an amount to be determined by the Court.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final

Judgment:

## I.

Permanently restraining and enjoining Defendants and their agents, servants, employees

and attorneys and all persons in active concert or participation with Defendants from violating,

directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Defendants and Relief Defendant to disgorge all ill-gotten gains received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations pursuant to Exchange Act Sections 21(d)(3), (5), (7) [15 U.S.C. §§ 78u(d)(3), (5), (7)];

**III.**

Ordering Defendants to pay civil monetary penalties under Exchange Act Section 21A [15 U.S.C. § 78u-1]; and

**IV.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Date:  July 26, 2023                    Respectfully submitted,


                                        /s/ *James P. Connor*
                                        James P. Connor*
                                        Carina A. Cuellar*
                                        U.S. SECURITIES AND EXCHANGE COMMISSION
                                        Division of Enforcement
                                        100 F Street, N.E.
                                        Washington, DC 20549
                                        Phone: (202) 551-8394 (Connor)
                                        Phone: (202) 551-6414 (Cuellar)
                                        Email: connorja@sec.gov (Connor)
                                        Email: cuellarc@sec.gov (Cuellar)

* *Pending admission pro hac vice*

Of Counsel
Timothy A. Work
Kevin Guerrero
Kristen Warden
U.S. SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549