**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SECURITIES AND EXCHANGE COMMISSION,

                      Plaintiff,

            - against -

JOSEPH LEWIS, et al.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ECF Case

No. 23 Civ. 6438 (CM)


# THE GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
# APPLICATION TO INTERVENE AND FOR A STAY OF DISCOVERY

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States
of America.

Jason A. Richman
Nicholas Roos
Assistant United States Attorneys
    *- Of Counsel -*

i

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 3

PROCEDURAL POSTURE ................................................................................. 9

ARGUMENT ................................................................................. 9

I.  THE GOVERNMENT SHOULD BE GRANTED PERMISSION TO INTERVENE.... 10

II.  A STAY OF DISCOVERY IS APPROPRIATE ................................................. 11

   A.  Applicable Law ................................................................................. 11

   B.  Discussion ................................................................................. 12

      1.  The Extent of Overlap ................................................................ 12

      2.  Status of the Criminal Case ......................................................... 13

      3.  The Interests of the Plaintiff and the Defendants........................ 14

      4.  The Public Interest ................................................................ 14

      5.  The Interests of the Court ......................................................... 17

CONCLUSION ................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Bd. of Governors of the Federal Reserve System v. Pharaon*, 140 F.R.D. 634 (S.D.N.Y. 1991) 18

*Bureerong v. Uvawas*, 167 F.R.D. 83 (C.D.Cal. 1996) .................................................................... 12

*Campbell v. Eastland*, 307 F.2d 478 (5th Cir. 1952) ..................................................................... 19

*Hicks v. City of New York*, 268 F. Supp. 2d 238 (E.D.N.Y. 2003) ............................................... 16

*In re Par Pharm, Inc. Sec. Litig.*, 133 F.R.D. 12 (S.D.N.Y. 1990) ............................................ 15

*Kashi v. Gratsos*, 790 F.2d 1050 (2d Cir. 1986) ........................................................................... 12

*Landis v. N. Am. Co.*, 299 U.S. 248 (1936) .................................................................................. 13

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83 (2d Cir. 2012) ................................... 13

*Parker v. Dawson*, No. 06 Civ. 6191 (JFB), 2007 WL 2462677 (E.D.N.Y. Aug. 27, 2007) ....... 14

*Phillip Morris Inc. v. Heinrich*, No. 95 Civ. 328 (LMM), 1996 WL 363156 (S.D.N.Y. June 28, 1996) ............................................................................................................................................ 18

*SEC v. Beacon Hill Asset Management LLC*, No. 02 Civ. 8855 (LAK), 2003 WL 554618 (S.D.N.Y. Feb. 27, 2003) .......................................................................................................... 18

*SEC v. Chakrapani*, 2010 WL 2605819 (S.D.N.Y. June 29, 2010) ............................................. 19

*SEC v. Chestman*, 861 F.2d 49 (2d Cir. 1988) .............................................................................. 12

*SEC v. Contorinis*, No. 09 Civ. 1043 (RJS), 2012 WL 512626 (S.D.N.Y. Feb. 3, 2012) ............ 20

*SEC v. Dubovoy*, 15 Civ. 6076 (D.N.J. Jan. 29, 2016) ................................................................... 2

*SEC v. Durante et al.*, 15 Civ. 9874 (RJS) (S.D.N.Y. Mar. 23, 2016) ........................................... 2

*SEC v. Nicholas*, 569 F. Supp. 2d 1065 (C.D. Cal. 2008) ......................................................... 2, 3

*SEC v. One or More Unknown Purchasers of Securities of Global Indus., Ltd.*, No. 11 Civ. 6500 (RA), 2012 WL 5505738 (S.D.N.Y. Nov. 9, 2012) ............................................................... 2, 20

*SEC v. Shah, et al.*, No. 22 Civ. 3012 (LJL) (S.D.N.Y. Dec. 9, 2022) ........................................... 3

*SEC v. Shkreli, et al.*, 15 Civ. 7175 (KAM), 2016 WL 1122029, (E.D.N.Y. Mar. 22, 2016) ................................................................................................... 2, 16

*SEC v. Treadway*, No. 04 Civ. 3464 (VM) (JCF), 2005 WL 713826, (S.D.N.Y. March 30, 2005) ......................................................................................................... 13

*SEC v. Wey*, 15 Civ. 7116 (PKC) (S.D.N.Y. June 9, 2016) ............................................................ 2

*Twenty First Century Corp. v. LaBianca*, 801 F. Supp. 1007 (E.D.N.Y. 1992) ..................... 10, 17

*Trustees of Plumbers and Pipefitters Nat'l Pension Fund, et al. v. Transworld Mechanical, Inc.*, 886 F. Supp. 1134 (S.D.N.Y. 1995) .......................................................................................... 15

*Tuzman*, 15 Civ. 7057 (AJN), Dkt. No. 43 ............................................................................. 14, 15

*United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982) ................................................................... 10

*United States v. McCarthy*, 292 F. Supp. 937 (2d Cir. 1968) ...................................................... 17

*United States v. One 1964 Cadillac Coupe DeVille*, 41 F.R.D. 352 (S.D.N.Y. 1966) ................. 14

*United States v. Percevault*, 490 F.2d 126 (2d Cir. 1974) ........................................................... 17

*Volmar Distrib., Inc. v. New York Post Co., Inc.*, 152 F.R.D. 36 (S.D.N.Y. 1993) .............. 13, 14

**Federal Statutes**

Rule 16 of the Federal Rules of Criminal Procedure ...................................................................... 15

Rule 24 of the Federal Rules of Civil Procedure ............................................................................ 10

## PRELIMINARY STATEMENT

The United States of America, by and through the United States Attorney for the Southern District of New York (the "Government"), respectfully submits this memorandum of law in support of its application (i) to intervene in the above-captioned case, pursuant to Rule 24 of the Federal Rules of Civil Procedure, and (ii) for a full stay in this matter, including a stay of all discovery in this case until the conclusion of the parallel criminal case, *United States v. Joseph Lewis, et al.*, No. 23 Cr. 370 (JGLC) (the "Criminal Case").   As the Court recognized in its September 25, 2023 order in this matter, a stay pending the Criminal Case is appropriate.   (Dkt. 28).   In concert with the Court's expressed inclination, the Government further details below why a full stay in this matter is appropriate, particularly since the defendants, through counsel, consent to the Government's request for a stay, and the SEC does not object to the request for a stay.

Courts in this district frequently stay civil discovery when there is a parallel criminal prosecution.   Here, the parallel Criminal Case arises from a near-identical set of facts and circumstances that underlie this action.   As a result, a stay is especially appropriate because any exchange of discovery would be asymmetrical and would allow the defendants to circumvent the criminal discovery rules and improperly tailor their defenses in the Criminal Case.   In similar situations, courts in this Circuit and others have often entered a stay of parallel civil actions when there is a related criminal prosecution with overlapping defendants and facts, even at times where, as is not the case here, a defendant objects.   *See, e.g.*, *SEC v. Billimek and Williams*, No. 22 Civ. 10542 (JHR), Dkt. 23 (S.D.N.Y. Apr. 24, 2023) (granting full stay with consent of defendants); *SEC v. Carroll,* No. 19 Civ. 7199 (AT), 2020 WL 1272287 (S.D.N.Y. Mar. 17, 2020) (granting, over defendants' opposition, a full stay); *SEC v. Wey*, No. 15 Civ. 7116 (PKC) (S.D.N.Y. June 9, 2016) (after Government's motion for partial stay of discovery, and over objection of multiple

1

defendants, implementing full stay of discovery, with the exception that SEC would produce testimony transcripts that had been produced in criminal case); *SEC v. Durante et al.*, No. 15 Civ. 9874 (RJS) (S.D.N.Y. Mar. 23, 2016) (after Government's initial motion for partial stay of discovery, fully staying discovery and proceedings in the matter); *SEC v. Shkreli*, *et al.*, No. 15 Civ. 7175 (KAM), 2016 WL 1122029, at *2-7 (E.D.N.Y. Mar. 22, 2016) (granting, over defendants' opposition, a full stay); *SEC v. Dubovoy*, No. 15 Civ. 6076 (D.N.J. Jan. 29, 2016); *SEC v. One or More Unknown Purchasers of Securities of Global Indus., Ltd.*, No. 11 Civ. 6500 (RA), 2012 WL 5505738, at *3 (S.D.N.Y. Nov. 9, 2012) (granting U.S. Attorney's Office request for full stay of discovery for six months over defendant's objection while criminal investigation was proceeding but prior to any criminal charge; *SEC v. Nicholas*, 569 F. Supp. 2d 1065, 1070 (C.D. Cal. 2008).   In addition, while there is one defendant in the SEC case not charged in the Criminal Case, this fact does not alter the calculus that a stay should be granted, particularly since that defendant (Carolyn Carter) also consents to the requested stay.   *See, e.g.*, *SEC v. Shah, et al.*, No. 22 Civ. 3012 (LJL), Dkt. 48 (S.D.N.Y. Dec. 9, 2022) (granting partial stay, requested by the Government, when civil case had more defendants than parallel criminal proceedings).

In sum, as expressed by the Court in its September 25, 2023 order, and as further detailed below, particularly in light of the near identical set of facts underlying the parallel Criminal Case, the complications that civil discovery would cause in that Criminal Case, and the consent of all defendants in this case, a full stay of this matter would be both typical and appropriate.

## FACTUAL BACKGROUND

This case and the Criminal Case arise out of the same underlying events.   The facts set forth below are described in greater detail in the indictment that was returned in the Criminal Case (the "Indictment" or "Ind."), which was unsealed on July 26, 2023, and are also described in greater detail in the SEC's complaint in this action (the "SEC Complaint" or "Compl."), which was filed on July 26, 2023.   In short, the Indictment alleges that between at least in or about 2013 and 2021, defendant Joseph Lewis engaged in multiple schemes to violate the securities laws through insider trading and by submitting false and misleading filings with the SEC.   (Ind. ¶ 1; *see also* Compl. ¶ 1).   On multiple occasions, Lewis misappropriated inside information from publicly traded companies in which he was a large investor and used that information to tip or direct the trading of his friends and associates.   (*Id.*).   Lewis tipped, among others, his co-defendants, Patrick O'Connor and Bryan "Marty" Waugh, as well as his personal assistants, romantic partners, and other acquaintances.   (*Id.*).

As detailed in both the Indictment and the SEC Complaint, Lewis is the founder and principal investor in Tavistock Group, an international private investment organization.   (Ind. ¶ 5; Compl. ¶ 26).[1]   Through his ownership of Tavistock Group, Lewis learned, among other things, nonpublic information about certain biotechnology companies in which Tavistock Group, through a private biotechnology investment fund (the "Hedge Fund"), had an ownership interest.

---

[1] Certain terms in the SEC Complaint and Indictment are anonymized.   The Government is interpreting certain anonymized terms in the SEC Complaint on information and belief.   For example, in Paragraph 20 of the SEC Complaint, the SEC Complaint defines the "Investment Group" to mean "Lewis' private investment organization, which has investments in over 200 operating companies."   (Compl. ¶ 20).   Based on comparisons to the facts alleged in the Indictment, the Government believes this to be a reference to the Tavistock Group.

(Ind. ¶¶ 5-6; Compl. ¶¶ 26-28).    Lewis understood that he had a duty of trust and confidence to maintain the confidential information he received and that there were restrictions on sharing it with third parties or trading on the basis of the information.    (Ind. ¶¶ 6-7; Compl. ¶¶ 29-31).

Both the Indictment and the SEC Complaint detail several particular and overlapping allegations of insider trading.    The Indictment begins with allegations concerning insider trading in Australian Agricultural Company ("AAC").    (Ind. ¶¶ 8-12).    More specifically, the Indictment alleges that AAC was a publicly listed Australian company that operated cattle feedlots and farms in Australia, and that Lewis owned a majority of AAC's stock and had two Tavistock employees on the AAC board of directors.    (*Id*. ¶ 8).    The Indictment further details that, between on or about January 25 and February 14, 2019, a monsoon caused significant flooding in Queensland, Australia.    (*Id.* ¶ 9).    At the beginning of February 2019, members of the board of directors began giving Lewis updates about the flooding and potential impact on the business. (*Id.*).    In particular, while press was publicly reporting cattle losses in the area, members of the board privately provided confidential information to Lewis about the financial losses that AAC could suffer before that information was made public.    (*Id.*).    On February 10, before it was public, a board member told Lewis that the losses were material, that AAC did not have insurance coverage relating to the cattle, and that the Australian government was not going to cover the losses.    (*Id.*).

After the February 10 board meeting, but before the company had publicly released any loss-related information, Lewis called O'Connor and they discussed that O'Connor and Waugh should sell their AAC stock.    (Ind. ¶ 11).    Lewis shared with O'Connor material non-public information about AAC on this call, and told O'Connor that he and Waugh should trade as soon

as possible. (*Id.*). O'Connor and Waugh both contacted their stockbroker to order the sale of their AAC stock after this call. (*Id.*). However, notwithstanding Lewis's tip, Waugh and O'Connor's broker was unable to execute their sell orders before AAC made its publicly announcement, so they were unable to execute in time to avoid losses. (*Id.*). When the stockbroker apologized to O'Connor, he responded by email, "Just wish the Boss would have given us a little earlier heads up." (*Id.*).

The next set of allegations in the Indictment concern trading in Solid Biosciences ("SLDB"), a publicly traded biotechnology company focused on developing treatments for Duchenne muscular dystrophy. (Ind. ¶ 13). Lewis became a significant shareholder of SLDB in or around 2018. (*Id.*). In or around July 2019, SLDB sought approximately $60 million in capital through a private investment in public equity ("PIPE") transaction. (*Id.* ¶ 14). Lewis later learned of the planned PIPE transaction—which was not public and subject to prohibitions on trading and confidentiality agreements—and on multiple occasions before the news was public, Lewis received updates about the negotiations. (*Id.* ¶ 15). Lewis then provided information about the planned PIPE transaction to a girlfriend, Waugh, and O'Connor, before the information was public. (*Id.* ¶¶ 16-19). Each of them traded on this information (though Waugh and O'Connor were unable to do so prior to SLDB issuing its press release announcing the transaction because they were in flight with Lewis). (*Id.*). Ultimately, Lewis's girlfriend made an approximately 118 percent gain, and Waugh and O'Connor made a profit. (*Id.*).

The third set of illegal trading outlined in the Indictment concerned Mirati Therapeutics ("Mirati"), a publicly traded oncology company focused on the development of cancer therapeutics. (Ind. ¶ 20). Again, Lewis, through his ownership stake in Mirati and control of a

Mirati board seat, learned material, non-public information about Mirati, and knew that the information he received was confidential and non-public.    (*Id.*).    For example, in or about 2019, Mirati was conducting a clinical trial for a drug that would inhibit mutations of the KRAS gene, which underlines approximately 20 percent of human cancers.    (*Id.* ¶ 21).    Lewis learned information about the ongoing clinical tests and trials before they were public, and explicitly discussed possible movement in Mirati's share price as a result of these trials with an employee of Lewis's hedge fund who had a board seat on Mirati's board of directors.    (*Id.* ¶¶ 21-22). Ultimately, again, Lewis gave insider information before it was public to a girlfriend, O'Connor, and Waugh, who then traded on this information before it was public.    (*Id.* ¶¶ 22-28).    O'Connor shared this information with a friend, suggested that his friend buy Mirati stock, and boasted that the "Boss is helping us out and told us to get ASAP."    (*Id.* ¶ 25).    O'Connor further ensured his friend that "All conversations on app [WhatsApp] is encrypted so all good.    No one can ever see." (*Id.*).    O'Connor also informed his friend that "Boss lent Marty [Waugh] and I $500,00 each for this," and particularly identified a specific date as the "big day" for Mirati.    (*Id.*).    O'Connor told his friend that "the Boss has inside info" and "knows the outcome" of the testing.    (*Id.*).

In addition, Lewis recommended to one of his assistants that she purchase Mirati stock in advance of the public announcement of the test results.    (Ind. ¶ 26).    Lewis told other friends, as well, to buy Mirati stock, and his assistant and friends all purchased Mirati before the company announced clinical trial results.    (*Id.*).    On or about October 28, 2019, Mirati announced favorable results for its clinical trial, and on or about October 29, 2019, Mirati's share price closed up approximately 16.7 percent from the previous day's close.    (*Id.*).    Following this announcement, O'Connor, Waugh, and others tipped by Lewis all sold their shares of Mirati for a

profit.    (*Id.* ¶ 27).    On or about November 11, 2019, Lewis asked Waugh and O'Connor to repay the loans he had given them for purchasing Mirati stock.    (*Id.* ¶ 28).    Waugh's wire record for the loan's repayment indicates it was a "loan payback for MRTX."    (*Id.*).

The fourth insider trading allegations in the Indictment relate to BCTG Acquisition Corporation ("BCTG").    (Ind. ¶¶ 29-33).    In or about January 2021, BCTG began negotiating a potential business combination with Tango Therapeutics ("Tango"), a privately owned life sciences company.    (Ind. ¶ 29).    Members of BCTG's board of directors updated Lewis about the status of the possible business combination and diligence process, which was confidential information subject to a non-disclosure agreement between the parties.    (*Id.*).    On or about February 4, 2021, Lewis saw O'Connor and Waugh, and told them to purchase BCTG stock, which they did that day.    On or about February 8, O'Connor told his broker to "buy all the BCTG we can" and both he and Waugh made additional purchases in the days and weeks to follow.    (*Id.* ¶ 30).    On or about March 10, 2021, BCTG provided an initial draft of a merger agreement to Tango, and began negotiating terms.    (*Id.* ¶ 31).    That month, Lewis told two of his personal assistants to purchase as much BCTG stock as they could, and told them that the stock could double, triple, or even quadruple in price.    (*Id.*).    On or about April 14, 2021, BCTG publicly announced its planned merger with Tango, and BCTG's stock price, from market close on or about April 13 to 15, 2021, increased by 14.5 percent. (*Id.* ¶ 33).

Finally, the Indictment contains allegations relating to Lewis's scheme to falsely report his ownership share of Mirati.    (Ind. ¶¶ 34-42).    A Canadian company, Mirati is limited by Canadian law from having any shareholder who owns more than 19.99 percent of the Company. (Ind. ¶ 34).    Lewis, aware of this limitation, used a number of his companies to obtain warrants

by Mirati that could only be exercised if his ownership stayed under 19.99 percent.    (*Id.*).    To remain under this threshold in appearance but in fact to own more additional stock that would increase his ownership of Mirati beyond 19.99 percent, Lewis used offshore shell entities that he controlled to purchase Mirati shares, and then failed to report his ownership in those companies and shares to the SEC.    (*Id.* ¶¶ 35-40).    Ultimately, after one of Lewis's employees sold millions of dollars worth of Mirati stock held by one of the shell entities, he transferred a portion of the proceeds (approximately $25 million worth) to Lewis, and kept approximately 7 percent of the sale money.    (*Id.* ¶ 41).    When HSBC bank inquired of the employee about the reason for the fund transfer, the employee told the bank that he was "repaying a loan from [Lewis] to me," after receiving confirmation that Lewis was "happy" with his explanation.    (*Id.*).    This was a false explanation, as the funds were actually proceeds from the sale of Mirati stock that Lewis in fact belonged to Lewis.    (*Id.*).

The SEC Complaint contains allegations overlapping those of the Indictment.    First, the SEC Complaint details Lewis's background and that he received, due to his ownership interest in various companies, material, nonpublic information, that he had a duty to maintain confidentially. (Compl. ¶¶ 26-31).    Then, the SEC Complaint details Lewis's alleged tips to a romantic interest, Carolyn Carter, and begins by explaining how Carter knew the information Lewis provided was confidential and not for distribution.    (*Id.* ¶¶ 32-37).    The SEC Complaint then turns to allegations concerning Carter's trading in what is defined as "Issuer A" in the SEC Complaint and which, on information and belief, appears to be SLDB.    (*Id.* ¶¶ 38-49).    As in the Indictment, the SEC Complaint focuses on the PIPE transaction sought by SLDB in July 2019.    (*Id.*).    Next, the SEC Complaint turns to allegations concerning what the SEC Complaint defines as "Issuer B,'

which, on information and belief, appears to be Mirati.   (*Id.* ¶¶ 50-99).   As in the Indictment, the SEC Complaint alleges that Lewis tipped O'Connor and Waugh (in addition to Carter) about Mirati, and that they traded on the information provided by Lewis for a gain.   (*Id.*).   The SEC Complaint does not contain allegations concerning AACo. or BCTG, or allegations about the false reporting of Mirati share ownership contained in the Indictment.

## PROCEDURAL POSTURE

A grand jury sitting in the Southern District of New York returned the Indictment on July 24, 2023.   The Indictment was unsealed on July 26, 2023 (the same day the SEC Complaint was filed), and the defendants appeared before Magistrate Judge Figueredo in the Criminal Case that same day.   On August 8, 2023, Judge Clarke held an initial status conference, and ordered the Government to produce discovery by November 10, 2023.   Judge Clarke also set a status conference for January 10, 2024.   At the initial status conference, counsel for O'Connor and Waugh disclosed to Judge Clarke that their clients were receiving "benefactor payments" from Tavistock Financial, owned by Lewis (*i.e.*, that Lewis was paying their fees).   After the parties submitted respective letters on this potential conflict, Judge Clarke set an additional court date to conduct a hearing, pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982).   That hearing is scheduled for October 2, 2023.

## ARGUMENT

The Government's requests to intervene and for a complete stay in this civil action should be granted.   If civil discovery were to proceed at this time, there would be a risk of significant interference with the Criminal Case.   The requested stay would not prejudice any of the parties to this civil action, particularly given the consent of the defendants to the requested stay; would

prevent the circumvention of important limitations on criminal discovery; and would preserve the Court's resources because many of the issues presented by the civil action will be resolved in the Criminal Case.

## I.    THE GOVERNMENT SHOULD BE GRANTED PERMISSION TO INTERVENE

Under Rule 24(a)(2) of the Federal Rules of Civil Procedure, anyone may intervene as of right in an action when the applicant "claims an interest relating to the property or transaction that is the subject of the action" and the applicant "is so situated that 'disposing of the action may as a practical matter impair or impede the movant's ability to protect its interests. . . .'"   Alternatively, Rule 24(b)(2) provides for permissive intervention when the movant "has a claim or defense that shares with the main action a common question of law or fact."   The Government respectfully submits that its application satisfies both of these provisions given the effect this civil proceeding would have on the Criminal Case and the identity of claims and facts between the parallel actions.

As a general rule, courts "have allowed the government to intervene in civil actions— especially when the Government wishes to do so for the limited purpose of moving to stay discovery."   *Twenty First Century Corp. v. LaBianca*, 801 F. Supp. 1007, 1009 (E.D.N.Y. 1992). The Government has a "discernible interest in intervening in order to prevent discovery in a civil case from being used to circumvent the more limited scope of discovery in the criminal matter." *SEC v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1988).

As an initial matter, intervention is warranted because the Government's interests in upholding the public interest in enforcement of the criminal laws cannot be protected adequately by the existing parties in this civil litigation, none of whom represent the Government's interests with respect to the investigation and enforcement of federal criminal statutes.   *See Bureerong v.*

*Uvawas*, 167 F.R.D. 83 (C.D. Cal. 1996) ("[T]he Government's prosecutorial and investigative interest is not adequately protected by any of the civil parties . . . .   Clearly neither the plaintiff or the defendants have this identical interest.").

Moreover, discovery and a trial in this action in advance of a criminal trial, could impair or impede the Government's ability to protect its interests in the enforcement of federal criminal law.   This case and the related Criminal Case center on the same overlapping insider trading schemes.   Holding a civil trial before the criminal proceedings would create the possibility that there will be two trials covering the same fraudulent acts.   This raises the probability that witnesses will be unnecessarily burdened by having to testify twice.   In light of those circumstances, the Government respectfully submits that its application to intervene should be granted.

## II.    A STAY OF DISCOVERY IS APPROPRIATE

### A.  Applicable Law

This Court has the inherent power to stay discovery in the interests of justice pending the completion of a parallel criminal case.   *See Kashi v. Gratsos*, 790 F.2d 1050, 1057 (2d Cir. 1986) ("[A] court may decide in its discretion to stay civil proceedings . . . when the interests of justice seem . . . to require such action." (internal citations and quotations omitted)).   "'[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)).   When considering whether to grant a stay, courts balance the following factors:

> (1) the extent to which the issues in the criminal case overlap with
> those presented in the civil case; (2) the status of the case, including
> whether the defendants have been indicted; (3) the private interests
> of the plaintiffs in proceeding expeditiously weighed against the
> prejudice to plaintiffs caused by the delay; (4) the private interests
> of and burden on the defendants; (5) the interest of the court; and (6)
> the public interest.

*Carroll*, 2020 WL 1272287, at *2 (quoting *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d

83, 99 (2d Cir. 2012)); *see also SEC v. Treadway*, No. 04 Civ. 3464 (VM) (JCF), 2005 WL 713826,

at *2-*3 (S.D.N.Y. March 30, 2005); *Volmar Distrib., Inc. v. New York Post Co., Inc.*, 152 F.R.D.

36, 39 (S.D.N.Y. 1993) (listing similar factors).  "Balancing these factors is a case-by-case

determination, with the basic goal being to avoid prejudice."  *Id.*

## B.  Discussion

Application of these factors here overwhelmingly weighs in favor of the Government's

requested stay, to which no party objects.

### 1.    *The Extent of Overlap*

That the criminal and civil cases involve nearly identical facts and issues weighs heavily

in favor of a stay.  "The most important factor at the threshold is the degree to which the civil

issues overlap with the criminal issues."  *Volmar Distrib.*, 152 F.R.D. at 39 (citing Judge Milton

Pollack, *Parallel Civil and Criminal Proceedings*, 129 F.R.D. 201, 203 (S.D.N.Y. 1989)); *see also*

*SEC v. Tuzman*, No. 15 Civ. 7057 (AJN), Dkt. No. 43 at 3 (S.D.N.Y. Mar. 1, 2016) (noting that

"substantial overlap between the civil and criminal proceedings" weighs in favor of stay); *Parker*

*v. Dawson*, No. 06 Civ. 6191 (JFB), 2007 WL 2462677, at *4 (E.D.N.Y. Aug. 27, 2007); *United*

*States v. One 1964 Cadillac Coupe DeVille*, 41 F.R.D. 352, 353 (S.D.N.Y. 1966) ("Where both

civil and criminal proceedings arise out of the same or related transactions the government is

ordinarily entitled to a stay of all discovery in the civil case until disposition of the criminal matter.").

As detailed in part above, even a cursory examination of the Indictment and the SEC Complaint reveals that the alleged wrongdoing is essentially the same. The SEC Complaint focuses on insider trading in two issuers, and the allegations regarding these issuers are both subsumed within the Indictment (which is, indeed, broader than the SEC Complaint with additional allegations). As in part detailed above, the two charging instruments contain several of the same particular acts and rely upon several identical trades and time periods. Indeed, particular pieces of evidence relied upon in the Indictment are also contained in the SEC Complaint. In short, it is clear that the two cases arise out of the "same or related transactions" and this factor heavily counsels in favor of a granting of the stay requested.

### 2.    *Status of the Criminal Case*

The return of an indictment in the criminal case is also a factor that weighs in favor of a stay. *See Tuzman*, No. 15 Civ. 7057 (AJN), Dkt. No. 43 at 3; *In re Par Pharm, Inc. Sec. Litig.*, 133 F.R.D. 12, 13 (S.D.N.Y. 1990) ("The weight of authority in this Circuit indicates that courts will stay a civil proceeding when the criminal investigation has ripened into an indictment."); *Trustees of Plumbers and Pipefitters Nat'l Pension Fund, et al. v. Transworld Mechanical, Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995) ("A stay of a civil case is most appropriate when a party to the civil case has already been indicted for the same conduct for two reasons: first, the likelihood that a defendant may make incriminating statements is greatest after an indictment has issued, and second, the prejudice to the plaintiffs in the civil case is reduced since the criminal case will likely be quickly resolved."); *see also Hicks v. City of New York*, 268 F. Supp. 2d 238, 242 (E.D.N.Y.

2003) ("Indeed, the strongest argument for granting a stay is where a party is under criminal indictment…."). Here, an Indictment has been returned against three of the defendants and Judge Clarke has already set a schedule for discovery and a next conference date. The Government has begun to produce discovery and will make substantial additional production in the coming weeks. The fourth defendant, Carolyn Carter, has consented to the stay, though she is not charged in the Indictment, as has the "relief defendant" in this matter, Jean O'Connor, who is also not charged in the Indictment. Thus, the status of the criminal case, and the return of the Indictment, also counsels in favor of a stay.

### 3. The Interests of the Plaintiff and the Defendants

No prejudice to the parties will result from the requested stay. Indeed, just the opposite. As noted, the defendants each consent to the requested stay. Moreover, a stay will prevent the defendants from having to choose between asserting their Fifth Amendment rights during civil discovery and thereby being prejudiced in this action or asserting those rights and thereby being prejudiced in the Criminal Case. *See Shkreli*, 2016 WL 1122029, at *3 n.3 ("[C]riminal defendants frequently seek stays in parallel civil enforcement proceedings, often due to an adverse inference that can arise from a party's invocation of the Fifth Amendment privilege against self-incrimination."). The SEC also does not oppose the requested stay. In addition, as there are not currently any discovery deadlines or a trial date in place in the SEC action, there will be no undue delay in the proceedings as a result of the stay. Accordingly, neither the plaintiff nor the defendants will be prejudiced by a stay—quite the contrary, the parties will all be prejudiced if this matter is allowed to proceed.

### 4. The Public Interest

14

Rule 16 of the Federal Rules of Criminal Procedure and Title 18, United States Code, Section 3500 provide that in criminal cases, the statements of Government witnesses shall not be the subject of discovery "until said witness has testified on direct examination" at trial. Thus, in the Criminal Case, the defendants would not be entitled to such statements until (or, as is the practice in this District, shortly before) trial. The Government and the public have an important interest in ensuring that civil discovery is not used to circumvent the well-founded restrictions that pertain to criminal discovery – restrictions that, *inter alia*, preserve the truth-seeking functions of the criminal process by restraining the ability of criminal defendants to tailor testimony, suborn perjury, manufacture evidence or intimidate witnesses. *See United States v. Percevault*, 490 F.2d 126, 129 (2d Cir. 1974) (noting that the Jencks Act "represents a legislative determination that access to a witness' statements could be useful in impeaching a witness but was not intended to be utilized in preparation for trial"); *United States v. McCarthy*, 292 F. Supp. 937, 942 (2d Cir. 1968) ("The claimed need to see such statements in advance in order to prepare to rebut them is little more than open notice of an intention to tailor testimony to fit the statement."); *Nicholas*, 569 F. Supp. 2d at 1070 (the criminal rules were "purposefully limited so as to prevent perjury and manufactured evidence, to protect potential witnesses from harassment and intimidation, and to level the playing field between the government and the defendant, who would be shielded from certain discovery by the Fifth Amendment").

Courts in this district have repeatedly endorsed limitations on civil discovery in recognition of the fact that a civil litigant should not be allowed to use civil discovery to avoid the restrictions that would otherwise apply in criminal discovery to a criminal defendant. *See, e.g.*, *SEC v. Beacon Hill Asset Management LLC*, No. 02 Civ. 8855 (LAK), 2003 WL 554618, at *1 (S.D.N.Y.

Feb. 27, 2003) (granting government's motion to stay and noting, "[t]he principal concern with respect to prejudicing the government's criminal investigation is that its targets might abuse civil discovery to circumvent limitations on discovery in criminal cases"); *Phillip Morris Inc. v. Heinrich*, No. 95 Civ. 328 (LMM), 1996 WL 363156 , at *19 (S.D.N.Y. June 28, 1996) (granting stay motion because if "civil discovery is not stayed, the criminal investigation will be prejudiced, as the Defendants may have an opportunity to gain evidence to which they are not entitled under criminal discovery rules"); *Bd. of Governors of the Federal Reserve System v. Pharaon*, 140 F.R.D. 634, 639 (S.D.N.Y. 1991) ("'A litigant should not be allowed to make use of the liberal discovery procedures applicable to a civil suit as a dodge to avoid the restrictions on criminal discovery and thereby obtain documents he would not otherwise be entitled to for use in his criminal trial.'" (quoting *Campbell v. Eastland*, 307 F.2d 478, 487 (5th Cir. 1952)); *Nicholas*, 569 F. Supp. 2d at 1070 (the criminal rules were "purposefully limited so as to prevent perjury and manufactured evidence, to protect potential witnesses from harassment and intimidation, and to level the playing field between the government and the defendant, who would be shielded from certain discovery by the Fifth Amendment"). Indeed, the rationale underlying a stay is even stronger in an indicted matter, given that a defendant in a charged criminal case will likely invoke his Fifth Amendment rights in the civil case and not participate in the very discovery process he seeks to use affirmatively. *See, e.g., SEC v. Chakrapani*, No. 09 Civ. 325 (RJS), 2010 WL 2605819 (S.D.N.Y. June 29, 2010) (inviting the Government to renew its motion to stay discovery if the defendant intends to invoke the Fifth Amendment if noticed for a deposition); *Nicholas*, 569 F. Supp. 2d at 1070 (noting when granting full stay that "[t]he specter of parties and witnesses invoking their Fifth Amendment rights would render discovery largely one-sided; the SEC would

16

produce scores of documents and witness testimony only to be precluded from gathering reciprocal discovery from the defendants").

Therefore, in order to avoid circumvention of the criminal discovery restrictions, including the provisions that are designed to prevent defendants from tailoring their testimony and intimidating witnesses, and because the defendants will not in any way be prejudiced, this factor weighs in favor of the Government's application.

### 5.       *The Interests of the Court*

Considerations of judicial economy also weigh in favor of granting a stay.   Courts have a strong interest in the efficient resolution of both the criminal and civil cases.   Issues common to both cases can be resolved in the criminal proceeding, thereby simplifying the civil action.   *See SEC v. Contorinis*, No. 09 Civ. 1043 (RJS), 2012 WL 512626, at *2 (S.D.N.Y. Feb. 3, 2012) ("Courts in this district have consistently found that a defendant convicted of securities fraud in a criminal proceeding is collaterally estopped from relitigating the underlying facts in a subsequent civil proceeding."); *SEC v. One or More Unknown Purchasers of Secs. of Global Indus.*, No. 11 Civ. 6500 (RA), 2012 WL 5505738, at *4 (S.D.N.Y. Nov. 9, 2012) ("[T]he Civil Case is likely to benefit to some extent from the Criminal Case no matter its outcome."); *Twenty First Century Corp.*, 801 F. Supp. at 1010-11 (recognizing judicial economy as a factor to be considered). Because the outcome of the Criminal Case could directly affect the conduct, scope, and result of the civil proceeding, this factor favors the Government's application.

*                    *                    *

In sum, the Government has requested a stay of the proceedings in this action; the defendants each consent to the stay; there is considerable overlap between the parallel proceedings;

17

charges have been filed in the Criminal Case and pretrial proceedings are underway; there is no prejudice to the parties from the requested stay; there is a strong public interest in preventing the civil discovery rules from being used to improperly obtain discovery in the criminal case; and judicial economy is ensured by the requested stay. Therefore, the balance of factors overwhelmingly favors a stay of discovery. A proposed order is attached as Exhibit A for the Court's consideration.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that its unopposed application to intervene and for a stay of this proceeding be granted in its entirety.

Dated: New York, New York
September 29, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:     /s/
JASON A. RICHMAN
NICHOLAS ROOS
Assistant United States Attorneys
One Saint Andrew's Plaza
New York, New York 10007
Telephone: (212) 637-2589

18